UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 05-cv-01016-RPM

MICHAEL L. ZINNA,

        Plaintiff,

v.

JAMES CONGROVE, individually,

        Defendant.

_____

## PLAINTIFF'S TRIAL BRIEF
_____

      Plaintiff Michael L. Zinna, through his undersigned counsel with Levine Sullivan Koch

& Schulz, L.L.P., pursuant to the Court's direction at the Final Pretrial Conference, submits this

Trial Brief summarizing the evidence he intends to present in support of, and the legal

parameters controlling, his claim for First Amendment retaliation under 42 U.S.C. § 1983, to be

tried to a jury beginning November 30, 2009.

### Introduction

      This case arises from the muckraking efforts of what was then a new kind of journalist,

one who used the internet and electronic media not only as vehicles to present his stories of

abuse of power by public officials and his opinions about those officials, but also as a means by

which he could gather tips and provide a forum for his readers and listeners to share their own

views.  When Mr. Zinna began his internet reporting, in the early years of this decade, at his

initial website under the domain name www.JeffcoExposed.com, which later became the website www.ColoradoExposed.com, he had only the barest inklings of where his efforts would lead him.  By the spring of 2005, however, Mr. Zinna had scored several stunning scoops about Jefferson County shenanigans, with resulting resignations by several Jefferson County public officials.  Mr. Zinna had become a watchdog to be reckoned with.

At that time, in the early days of the chairmanship of the Jefferson County Board of County Commissioners by then-newly elected commissioner Defendant James Congrove, Mr. Congrove believed – wrongly – that Mr. Zinna's prior support for him during the 2004 election would guarantee Mr. Zinna as his lapdog.  Mr. Congrove was sorely mistaken.

When Mr. Zinna uncovered what he believed to be improper financial dealings by Mr. Congrove, and indicated that he was prepared to publish his findings just as he had publicized the misdeeds of other Jefferson County political figures, Mr. Congrove turned on Mr. Zinna. Using the leverage available through Mr. Zinna's prior investments in property at the Jefferson County Airport, Mr. Congrove insisted that Mr. Zinna refrain from any further reporting and commentary on Jefferson County officials, telling Mr. Zinna that Mr. Zinna's investments hung in the balance of Mr. Zinna's silence:  "You need to decide if you're going to be a developer or a reporter."

Mr. Zinna chose to be a reporter.

In the wake of that decision, Mr. Congrove has lived up to his reputation as a vindictive enforcer, an ex-cop who uses intimidation and a network of informants to collect damaging information on opponents, and a politician with no compunction to bring all of his official powers to bear to squelch Mr. Zinna's free speech.  This case will canvass the tawdry efforts of

Mr. Congrove and his associates first to try to silence Mr. Zinna, and when those efforts were unsuccessful, to put into action the old doggerel, "You mess with us; we'll mess with you."

Mr. Congrove pulled his levers of power, forcing retaliatory eviction proceedings against Mr. Zinna and Mr. Zinna's tenants at the airport; directing the use of close-contact monitoring of Mr. Zinna, as well as long-distance surveillance of Mr. Zinna, his girlfriend, and his attorney; using County staff and County-hired investigators to uncover every possible shred of embarrassing and disparaging information about Mr. Zinna; soliciting the collection of derogatory information about Mr. Zinna, including Mr. Zinna's military discharge record; launching a campaign of attacks from a website, www.ColoradoWackoExposed.com, and through a series of mailings, containing information collected by the clandestine County-funded investigations against Mr. Zinna; and, engaging in a campaign of intimidation against Mr. Zinna's radio advertisers in an ultimately-successful maneuver to drive Mr. Zinna's radio shows off the airwaves. Entirely emblematic of this coordinated effort against Mr. Zinna was Mr. Congrove's tacking up of a color mug shot of Mr. Zinna on the wall of Mr. Congrove's office at the Jefferson County Administration Building, the chairman's singular message to every Jefferson County staffer – Mr. Zinna was Public Enemy Number One.

The series of adverse actions against Mr. Zinna that will be detailed in this case constitute a mosaic of retaliation, a pattern of efforts by Mr. Congrove to punish Mr. Zinna for Mr. Zinna's exercise of his free speech rights. This case seeks money damages under 42 U.S.C. § 1983. Mr. Zinna alleges that Mr. Congrove acted under color of state law to deny Mr. Zinna his rights under the First Amendment to the United States Constitution. As detailed below, Mr. Zinna will show at trial that he was engaged in constitutionally protected activity, and that Mr. Congrove

directly, or through the actions of subordinates or associates at his direction, undertook a pattern of adverse actions that were substantially motivated as a response to Mr. Zinna's First Amendment activities and that would have chilled a person of ordinary firmness from continuing to engage in those First Amendment activities. *See Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2000). Mr. Congrove's principal defenses to this claim – either that he is not responsible for what his friends and subordinates did to Mr. Zinna, or that if he was involved, he had a First Amendment right of his own to do what he did – ring hollow. There is simply no right under the Constitution for a public official to use the trappings of his office to punish a private citizen for that person's free speech. The right of citizens to be free from government-funded and government-orchestrated retaliation is fundamental, and without enforcement of that protection, the right to speak freely, to express our opinions and to question authority, would be nothing but a mirage.

## Summary of Evidence to Be Presented

The basic outline of Mr. Zinna's case already has been detailed in his briefing in response to Mr. Congrove's unsuccessful summary judgment motion, as well as in the statement of claims in the Final Pretrial Order. Nevertheless, to recapitulate that outline here, Mr. Zinna intends to show at trial, *inter alia*, the following facts:

### 1. Mr. Zinna's First Amendment activities.

Mr. Zinna came to the work of investigative journalism in some respects by happenstance, initially as a result of his earlier business dealings at the Jefferson County

Airport.[1]  As a result of what he saw and heard in connection with the management of the airport,

Mr. Zinna launched his initial news website in 2003.  Through that website, and its subsequent

updated versions, and then through his radio shows on the Clear Channel Communications radio

station KHOW-AM, Mr. Zinna engaged in a then-unusual blend of investigative reporting and

opinion commentary.  Mr. Zinna's reporting and editorializing often, although not exclusively,

focused on what he perceived to be malfeasance in Jefferson County government.  Mr. Zinna's

website became something close to required reading for the denizens of the Jefferson County

Administration Building, often if only in cringing anticipation of what new scandal or

embarrassment he would uncover.

     2.  BJC Development settlement negotiations.

     Separate from Mr. Zinna's journalistic activities, in the spring of 2005, the firm BJC

Development Corporation, a company in which Mr. Zinna held a financial stake, and Jefferson

County reached an agreement on all material terms for the resolution of litigation between those

two parties that had arisen over a development proposal for three parcels of land near the

Jefferson County Airport.  Indeed, documents reflecting these agreed-upon terms were actually

exchanged between the parties.  Those negotiations, however, ran aground on the demand made

by Mr. Congrove, communicated to BJC Development's representatives through then-County

Attorney Frank Hutfless that a condition of the settlement would be that Mr. Zinna must refrain

---

[1] Mr. Congrove's defense asserts that Mr. Zinna used his journalistic activities principally as a vehicle for exacting revenge on Jefferson County officials for their refusal to agree to business deals with Mr. Zinna at the airport.  The only basis for this contention is Mr. Congrove's imagination.  There is simply no support for the notion that Mr. Zinna's journalistic activities were intended to extort business concessions from Jefferson County.

from engaging in any newsgathering at Jefferson County's governmental offices, and he must also desist from all commentary about Jefferson County officials. When Mr. Zinna refused to comply with those additional requirements, the County scuttled the negotiated agreement with BJC Development.

2.  Surveillance activities against Mr. Zinna and his friends and associates.

The evidence in this case also will show that in the wake of the breakdown of the BJC Development settlement negotiations, Mr. Congrove directed the County Attorney's office to bring its resources to bear in terminating all of Mr. Zinna's activities with the county.  In this context, Mr. Congrove directed County Attorney Hutfless to hire Mr. Congrove's longtime friend, former police officer Daril Cinquanta to conduct surveillance of Mr. Zinna.  This surveillance effort included videotaping Mr. Zinna's appearances at county commission meetings, as well as conducting stake-outs of Mr. Zinna's meetings with his girlfriend.  The latter work purportedly was to determine whether Mr. Zinna was living in his unit at the airport, a fact that was common knowledge among all the tenants of Mr. Zinna's units at the airport, and which Mr. Zinna freely admitted in a public colloquy with Mr. Congrove during a county commission meeting in mid-2005, well before Mr. Cinquanta began his surveillance work.

In addition to the surveillance and background research on Mr. Zinna conducted by Mr. Cinquanta, Mr. Congrove also directed then-Assistant County Attorney Duncan Bradley to compile a massive dossier on Mr. Zinna.  (Mr. Bradley was another friend, political supporter and former law enforcement colleague of Mr. Congrove, and he was hired by Mr. Hutfless explicitly at the instruction of Mr. Congrove, who also informed Mr. Hutfless that Mr. Bradley would be his liaison for all legal matters involving Mr. Zinna.)  Within Mr. Bradley's

voluminous file on Mr. Zinna were substantial documents compiled by Mr. Cinquanta regarding Mr. Zinna's prior arrests for domestic violence, Mr. Zinna's divorce case records, and his police mug shot. It appears that at one time Mr. Bradley's dossier even contained a psychiatric profile of Mr. Zinna compiled at county expense but which has never been produced in this case and appears now to be missing. In addition, also in this file were records collected by a second private investigator, Evan Elliott, this one hired by one of Mr. Congrove's friends in the tenant association at the airport. The records that Mr. Elliott obtained, which made their way into Mr. Bradley's file on Mr. Zinna, included Mr. Zinna's military discharge records.

In addition to this investigative work against Mr. Zinna, managed by county attorneys at Mr. Congrove's direction, Mr. Congrove also directed that the Jefferson County Sheriff's Department provide close-contact monitoring of Mr. Zinna by sheriff's deputies whenever Mr. Zinna arrived at the Jefferson County government offices. Indeed, the evidence will include a recording that Mr. Zinna made on a pocket tape-recorder of an entire walk through the county's offices, including rides up and down elevators, with a sheriff's deputy in close contact with him, chaperoning Mr. Zinna's every move (and necessarily impinging on any effort by Mr. Zinna to obtain surreptitious tips or information from his usual contacts in Jefferson County government).

3. Eviction proceedings against Mr. Zinna's tenants.

The evidence also will show that when Mr. Congrove and the county attorneys working on the campaign to discredit Mr. Zinna concluded that they would be unable to evict Mr. Zinna himself from his lease at the airport – because Mr. Zinna was no longer living in his unit – Mr. Congrove directed the county attorney's office to pursue eviction proceedings against every one of the tenants of the properties managed by Mr. Zinna, including the prior attorney who was

representing Mr. Zinna in this case.  The properties were owned by Rafael and Carmella Aiello, who had granted Mr. Zinna a purchase option in the properties contemporaneous to their execution of a property management contract with Mr. Zinna.  That eviction effort ostensibly was premised on the view that Mr. Zinna's tenants were not in compliance with a lease requirement mandating that Mr. Zinna's tenants be engaged in "ancillary aviation" uses.  This allegation of improper use of the office units at the airport was in fact pretextual, not only because the county had no clear definition of its own as to what constituted an ancillary aviation use, but also because at least one of Mr. Zinna's tenants who was a target of the eviction proceeding clearly was engaged in aviation related uses of its unit.  Moreover, the county's attack on Mr. Zinna's tenants stands in sharp contrast to the many other tenants on other airport leasehold sites in the Lima HOA tenant association, who were all subject to the "ancillary aviation" use requirement, and who were themselves not engaged in ancillary aviation uses of their facilities, but who were not the object of any eviction proceedings by the county.

In the midst of the eviction efforts against Mr. Zinna's tenants, Mr. Congrove directed county attorneys to increase their leverage against Mr. Zinna by having a county representative notify the bank carrying the mortgage on the properties' leasehold interest that Mr. Zinna purportedly was in default on that lease and that the county intended to terminate that lease – which was the collateral for the bank's loan – unless the bank foreclosed on the Aiello's note, eliminating the property that was the basis of Mr. Zinna's purchase option agreement.  In the face of this pressure from the county, the bank's foreclosure proceedings against Mr. Zinna were inevitable, and Mr. Zinna ultimately lost his financial stake in his office unit properties in the Lima HOA office development when the bank repossessed his units.  Interestingly, once Mr.

Zinna's interest in the leasehold for the office properties at the airport was removed by the bank's foreclosure, those office units have remained empty, with no income flowing to the bank, or to the county.

### 4. Disparaging publications against Mr. Zinna.

The evidence in this case also will show that Mr. Congrove, not satisfied with the leverage brought to bear against Mr. Zinna up through the spring of 2006, turned to new tactics in April of that year. It was then that Mr. Congrove's political ally Robert Cook offered to set up a website to attack Mr. Zinna. That website – www.ColoradoWackoExposed.com – became active in May 2006, using false registration information indicating a website owner in Central America, and emblazoned with a super-enlarged color photo of Mr. Zinna's Jefferson County mug shot (the same one in Mr. Congrove's office) staring out from the home page of the website. In addition, on that website were materials that a legal assistant in the county attorney's office remembers having scanned earlier that year into digital images for Mr. Bradley from his dossier of county-collected materials on Mr. Zinna. Included in those digital images that appeared on the ColoradoWackoExposed website were not only materials that Mr. Cinquanta had gathered, but also the military discharge record that Mr. Elliott also had gathered.

When the ColoradoWackoExposed website became active, Mr. Congrove affirmatively solicited others in the county administration not only to visit the website but to contribute material to the website. Indeed, Mr. Congrove circulated an email from the website with explicit instructions on how to upload more damaging information about Mr. Zinna to the website.

In addition to the website publications in the spring of 2006, Mr. Congrove also appears to have orchestrated a campaign of mass postal mailings of copies of the very same derogatory

materials that were being published on the website to virtually every one of the advertisers and radio station management executives for the radio shows he was producing on KHOW-AM radio.  In the wake of those mass mailings, and contrary to the radio station's professed desire to keep Mr. Zinna's radio shows on the air despite some payment difficulties with Mr. Zinna, the radio station refused to renew Mr. Zinna's contracts for those shows in June 2006.

In the midst of Mr. Zinna's efforts to negotiate a new contract at a different radio station, the ColoradoWackoExposed website sent out a series of email messages that contained virtually verbatim text from email messages that Mr. Zinna had sent out on June 14, 2006.  In other words, the ColoradoWackoExposed website was in possession of private, confidential email messages that Mr. Zinna had sent out to his friends and business contacts using his wireless internet access from his home, and which the ColoradoWackoExposed website then emailed out to third parties without regard to the confidential nature of those communications.  Among the recipients of the emails from ColoradoWackoExposed, including the text of Mr. Zinna's intercepted email communications, was the very person at the new radio station with whom Mr. Zinna was negotiating.  Not surprisingly, this radio station executive became incensed at the public disclosure of her confidential discussions with Mr. Zinna, and all further discussions regarding launching Mr. Zinna's radio shows on her station were halted thereafter.

5.  Effects of retaliation on Mr. Zinna's radio career

Mr. Congrove makes much in his defense of his contention that Mr. Zinna's radio shows at the KHOW radio station were not profitable at the time they ended in 2006.  This point, however, ignores the substantial growth potential that Mr. Zinna had developed through his multi-media approach to newsgathering and opinion commentary, relying on both his radio

shows and his internet websites.  The loss of Mr. Zinna's radio shows ultimately spelled the end

of Mr. Zinna's radio career, costing him not only his substantial investment in that venture, but

also depriving the public of his unique, albeit often derided, approach of local news.  Mr. Zinna

now hosts a current affairs television show on the public television station KBDI Channel 12,

and he has hopes for expanding his work in television journalism.  However, the retaliation by

Mr. Congrove has ended for good the kind of muckraking talk radio journalism that once was

Mr. Zinna's hallmark.

<u>**Legal Parameters**</u>

I.      **The First Amendment Retaliation Claim Here Is Controlled By The
Requirements For Non-Employer Defendants Set Out In *<u>Worrell v. Henry</u>*.**

In this case under 42 U.S.C. § 1983, in contrast to the traditional *Pickering* balancing test

that is applicable to claims of First Amendment retaliation by public employees, the Tenth

Circuit has announced a different framework for retaliation claims by non-employees, a

framework that is more protective of the free speech rights of private citizens who have no

employment or contractual relationship with the government.  *See Worrell v. Henry*, 219 F.3d

1197, 1212 (10th Cir. 2000); *see also Perez v. Ellington*, 421 F.3d 1128, 1131-32 (10th Cir.

2005); *Mimics, Inc. v. Village of Angel Fire*, 394 F.3d 836, 847 (10th Cir. 2005); *Greeley Publ'g

Co. v. Hergert*, No. 05-980, 2006 WL 1581754, at * 10, 36 Media L. Rep. 1368 (D. Colo. June 6,

2006) ("In *Worrell*, the Tenth Circuit concluded in the context of First Amendment retaliation

claims that 'an alternative to the *Pickering* balancing is warranted when allegations of retaliatory

conduct are directed at a defendant who is not the plaintiff's employer and when there is no

contractual relationship between them.'") (quoting *Worrell*, 219 F.3d at 1212).

Under the *Worrell* framework, a non-employee plaintiff seeking to recover damages on a claim of First Amendment retaliation must demonstrate the following elements:

(1) that the plaintiff "was engaged in constitutionally protected activity";

(2) that the defendant's actions caused the plaintiff "to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity"; and

(3) that the "defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct."

*Worrell*, 219 F.3d at 1212 (quoting *Lackey v. County of Bernalillo*, No. 97-2265, 166 F.3d 1221 (Table), 1999 WL 2461, at * 3 (10th Cir. Jan. 5, 1999)).

> **A.    The Tenth Circuit requires a showing only that the Plaintiff's First Amendment activity was at least a substantial motivating factor in the Defendant's adverse action.**

In this case, although the Defendant certainly does not concede any of the elements of the *Worrell* test, the principal focus of the parties' dispute will center on the third element of Mr. Zinna's retaliation claim, whether Mr. Congrove's adverse actions were "substantially motivated" as a response to Mr. Zinna's First Amendment activity.

The particular phrasing of this state-of-mind requirement – that the defendant's conduct was "substantially motivated" by the plaintiff's speech – is a variation on the phrasing of this requirement in the public employee context, where the U.S. Supreme Court has articulated the test as requiring proof that the protected First Amendment activity was "a substantial or motivating factor" in the government's adverse action against an employee.  *See Bd. of County Comm'rs v. Umbehr*, 518 U.S. 668, 675 (1996) (citing *Mt. Healthy City Bd. of Ed. v. Doyle*, 429 U.S. 274, 287 (1974)).  This formulation, although requiring more than a trivial retaliatory

animus, does **not** require a plaintiff to prove that retaliation was the sole, or even the principal, intent of the defendant with respect to the defendant's adverse action against the plaintiff. *See Mason v. Okla. Turnpike Auth.*, 115 F.3d 1442, 1454-55 (10th Cir. 1997) (upholding a jury instruction reading, "The Plaintiff is not required to prove that political patronage was the sole motivation or the primary motivation for the Defendants; decision to terminate his employment. The Plaintiff need only prove that political patronage was a substantial or motivating factor in the decision to discharge him."); *see also Davey v. Lockheed Martin Corp.*, 301 F.3d 1204, 1212-14 (10th Cir. 2002) (upholding jury instruction reading, "In showing that plaintiff's sex was a motivating factor, plaintiff is not required to prove that her sex was the sole motivation or even the primary motivation for defendant's decision. The plaintiff need only prove that sex played a part in the defendant's decision even though other factors may have also motivated the defendant.").

        In light of this derivation of the "substantial motivation" requirement from the phrase "a substantial or motivating factor," it is clear that the degree of retaliatory animus that Mr. Zinna must prove in this case is not overwhelming or exclusive or primary.  Rather, Mr. Zinna need only prove that Mr. Congrove's well-documented antipathy against Mr. Zinna's First Amendment activities was responsible at least in part for Mr. Congrove's adverse actions.  *See, e.g.*, *Bloch v. Ribar*, 156 F.3d 673, 681 (6th Cir. 1998) ("[W]e must consider whether Ribar's action in releasing the information was motivated *at least in part* as a response to the Blochs' exercise of their first amendment rights.") (emphasis added).

**B.      The evidence will support a finding of substantial motivation based on the Plaintiff's First Amendment activity.**

The evidence at trial will indeed demonstrate that Mr. Congrove's actions against Mr. Zinna were substantially motivated by Mr. Zinna's free speech activities. For example, at the very outset of Mr. Congrove's retaliatory actions, Mr. Congrove delivered his ultimatum to Mr. Zinna that Mr. Zinna must chose between his investments in Mr. Zinna's properties at the Jefferson County Airport and his work as a journalist, making clear that Mr. Zinna's journalistic activities would be the price of securing his commercial investments. Similarly, Mr. Congrove ensured that his long-time friend Daril Cinquanta relayed to Mr. Zinna's associates and tenants at the airport, including Robert Laidley, that it was Mr. Zinna's commentary on his website and his radio show that was prompting their plans to "mess with" Mr. Zinna. The effort by Mr. Congrove to have the County install the so-called "Zinna Switch" in the commission's chambers so as to be able to cut-off Mr. Zinna's public comments at commission meetings also underscores Mr. Congrove's fixation on Mr. Zinna's speech activities. In addition, the fevered focus of Mr. Congrove and all of his associates on Mr. Zinna's website and radio commentary, and their glee at the launch of the ColoradoWackoExposed website, further buttresses the conclusion that it was Mr. Zinna's speech activities more than anything else that prompted Mr. Congrove's adverse actions.

Of course, Mr. Congrove now argues that some of the adverse actions against Mr. Zinna would have been taken even without any retaliatory animus from him. Thus, for example, Mr. Congrove contends that the eviction proceedings against Mr. Zinna were prompted not by Mr. Zinna's free speech activities but by Mr. Zinna's alleged non-aviation-related uses of airport property. This contention, however, cannot withstand scrutiny in the face of the fact that not

even the County Attorney had a definition for what constituted a proper "ancillary aviation" use of airport property, and the County failed to pursue eviction proceedings against other airport tenants who were similarly situated with Mr. Zinna.

Mr. Congrove also argues that the BJC Development negotiations foundered not based on any animus against Mr. Zinna's journalistic activities, but rather because of the victory that the County had obtained in underlying court proceedings.  Mr. Zinna's evidence, however, will demonstrate that the parties had reached an agreement with respect to all material terms of the dispute, leaving only the finalization of the written documents reflecting the parties' agreement when the deal was blown up by Mr. Congrove's eruption of vitriol over Mr. Zinna's resumption of his journalistic activities aimed at Jefferson County officials.  In this vehement reaction against Mr. Zinna's criticisms of county leaders, there can be no question that Mr. Congrove's actions were "substantially motivated" by Mr. Zinna's First Amendment activities.

## II.     The Defendant Does Not Have A First Amendment Right To Engage In Retaliatory Speech Against The Plaintiff.

The last redoubt of Mr. Congrove's defenses in this case is his contention that he had a First Amendment right of his own to engage in disparaging  speech against Mr. Zinna.  Mr. Congrove's defense here, however, runs afoul of the long-settled doctrine that a public official may not engage in otherwise lawful conduct when the official's purpose for such conduct is to punish another person for that person's exercise of their own First Amendment rights.  *See DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990) ("An act taken in retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if the act, when taken for a different reason, would have been proper.") (quoting *Matzker v. Herr*,  748 F.2d

1142, 1150 (7th Cir. 1984), overruled on other grounds in *Salazar v. City of Chicago*, 940 F.2d

233, 240 (7th Cir.1991)).

 Indeed, this proposition that a public official may not do a lawful thing for a retaliatory

purpose is ubiquitous throughout the cases. *See, e.g., Mt. Healthy City Sch. Dist.*, 429 U.S. at

283-84; *Perez*, 421 F.3d at 1132 (quoting *DeLoach*, 922 F.2d at 620); *Mimics*, 394 F.3d at 897

(quoting *DeLoach*, 922 F.2d at 620); *Collopy v. City of Hobbs*, 27 Fed. Appx. 980, 987 (10th Cir.

Dec. 26, 2001) (quoting *DeLoach*, 922 F.2d at 620); *Worrell*, 219 F.3d at 1215 (quoting

*DeLoach*, 922 F.2d at 620); *Lackey*, 1999 WL 2461, at *3 (quoting *DeLoach*, 922 F.2d at 620);

*Bloch*, 156 F.3d at 681-82 (quoting *DeLoach*, 922 F.2d at 620); *Malik v. Arapahoe County Dept.*

*of Social Servs.*, 987 F. Supp. 868, 880 (D. Colo. 1997) ("The controlling case in this circuit is

*DeLoach v. Bevers*, 922 F.2d 618, 620 (10th Cir.1990), which held that '[a]n act taken in

retaliation for the exercise of a constitutionally protected right is actionable under § 1983 even if

the act, when taken for a different reason, would have been proper.'"); *see also Thaddeus-X v.*

*Blatter*, 175 F.3d 378, 386 (6th Cir. 1999) (en banc) ("[G]overnment actions, which standing

alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in

substantial part by a desire to punish an individual for exercise of a constitutional right."); *Allah*

*v. Seiverling*, 229 F.3d 220, 224-25 (3d Cir. 2000) (same). Even the state courts addressing

retaliation claims have recognized this principal. *See, e.g., Tichinin v. City of Morgan Hill*, 177

Cal. App. 4th 1049, 99 Cal. Rptr. 3d 661, 689 (2009) ("Moreover, as Tichinin correctly notes,

actions that are otherwise proper and lawful may nevertheless be actionable if they are taken in

retaliation against a person for exercising his or her constitutional rights.

This doctrine has even been applied in precisely the kind of situation that Mr. Congrove claims justifies his own retaliatory attacks on Mr. Zinna.  Thus, for example, in *Bloch*, the Sixth Circuit found that a sheriff's embarrassing disclosures to local news media of information about the plaintiff after she had publicly criticized the sheriff's handling of her rape case were not protected by the sheriff's own First Amendment rights: "While both Harrington and Ribar had the right to respond publicly to the criticism lodged against them, neither are permitted to do so with the intent of injuring the complainant and chilling such a person from continuing to exercise his or her constitutional rights."  *Bloch*, 156 F.3d at 682 (citing *Barrett v. Harrington*, 130 F.3d 246, 264 (6th Cir. 1997) (holding that a judge could be found to have retaliated against a litigant in violation of the litigant's First Amendment rights based on the judge's humiliating and denigrating public statements to the news media)).

Similarly, in *Foxworthy v. Buetow*, the District Court for the Southern District of Indiana found that actions by leaders of a local sewer district to place advertisements in a local newspaper castigating the plaintiff for his alleged misconduct in a ballot initiative petition drive were not protected either by the local officials' personal First Amendment rights or by the government speech doctrine.  *See* 492 F. Supp. 2d 974, 983 and 986 (S.D. Ind. 2007).  The court noted that the government speech doctrine has never been invoked in any published decision to shelter "government speech made in retaliation to a citizen's exercise of his First Amendment rights."  *Id.* at 986.  Were the doctrine to be so extended, the essential protections of Section 1983 as a remedy for government deprivations of free speech rights "would be severely undercut."  *See id.*

In another case where government officials sought to punish a person for his First Amendment activities by making embarrassing disclosures to the news media, the District Court for the District of Delaware invoked the *DeLoach* doctrine that government officials may not take otherwise lawful conduct for a retaliatory purpose, holding that speech that would otherwise be permissible for a government official is not permissible when it is disseminated with an intent to punish another person for that person's exercise of First Amendment rights:  "Thus, assuming that defendants' motive was retaliatory, it was irrelevant whether or not they may have had a right to respond under the First Amendment."  *Neuberger v. Gordon*, 567 F. Supp. 2d 622, 636 (D. Del. 2008).  As the court went on to explain, "official retaliation for the exercise of *any* constitutional right creates an actionable claim under Section 1983 . . . [I]t can never be objectively reasonable for a government official to act with the intent that is prohibited by law." *Id.* at 641 (quoting *Anderson v. Davila*, 125 F.3d 148, 162 (3d Cir. 1997), and *Monteiro v. City of Elizabeth*, 436 F.3d 397, 404 (3d Cir. 2006)) (emphasis in original).

These cases make clear that Mr. Congrove is simply wrong in his assertion that he had a right under the First Amendment to engage in retaliatory speech against Mr. Zinna.  The law of this Circuit, as well as elsewhere, is that a public official may not do for a retaliatory purpose what he would otherwise be permitted to do.[2]  To the extent that Mr. Congrove engaged in

---

[2] Mr. Congrove's reliance on cases such as the Fourth Circuit's decision in *Suarez Corp. Indus. v. McGraw*, 202 F.3d 676, 687 (4th Cir. 2000), is inapposite.  Not only does that case involve a plaintiff's commercial speech activity, which is arguably subject to less protection under the First Amendment, the Fourth Circuit's analysis in *Suarez* simply fails to account for the long-settled doctrine in *DeLoach* and the many similar cases that a government official may not engage in otherwise lawful conduct for a retaliatory purpose.  *See id.* at 687-88 (discussing cases but failing to address *DeLoach* in the Tenth Circuit or *Matzker* in the Seventh Circuit).

derogatory publications about Mr. Zinna or publications that disclosed embarrassing information about Mr. Zinna, using materials that had been collected with County funds and coordinated by county staff, Mr. Congrove has no defense under the First Amendment.  Because those publications were substantially motivated by Mr. Congrove's intent to punish Mr. Zinna for Mr. Zinna's free speech activities, Mr. Congrove is liable for retaliation.  *See DeLoach*, 922 F.2d at 620.

## Potential Evidentiary Issues

Counsel for the parties have been able to work cooperatively on evidentiary issues leading up to the trial of this case.  Nevertheless, one particular issue continues to divide the parties, and because of its significance, Plaintiff believes it best to address that issue here.  That issue is the Defendant's responsibility for spoliation of electronic evidence.

As the Court is certainly aware, every party in any lawsuit has a duty to preserve potentially relevant evidence once that person has reason to believe that litigation is likely or imminent.  *See Cache La Poudre Feeds, LLC v. Land O'Lakes, Inc.*, 244 F.R.D. 614, 629 (D. Colo. 2007) ("A party must ensure that relevant information is retained on a continuing basis once the preservation obligation arises."); *see also Silvestri v. General Motors Corp.*, 271 F.3d 583, 591 (4th Cir.2001); *Kronisch v. United States*, 150 F.3d 112, 126 (2d Cir. 1998); *In re Napster, Inc. Copyright Litig.*, 462 F. Supp. 2d 1060, 1067 (N.D. Cal. 2006).  The failure to preserve potentially relevant information when a party is under a duty so to preserve it can lead to the imposition of an adverse-inference instruction to the jury, directing that the jury is free to conclude that the evidence the party failed to preserve would have been adverse to the merits of non-preserving party's claim or defense.  *See Cache La Poudre Feeds*, 244 F.R.D. at 630.

In this case, the evidence will show that Mr. Congrove used two different County-owned computers during the pendency of this lawsuit.  The evidence also will show that Mr. Congrove failed to preserve any of the files on the computer that he used during the relevant time period of the activity of the ColoradoWackoExposed website.  Subsequent analysis of Mr. Congrove's computer shows that although some vestigial indications still remain on the computer's hard drive reflecting the fact that Mr. Congrove visited the ColoradoWackoExposed website during the relevant time period in 2006, all of the user files from that computer have been deleted.  In addition to the loss of the user files on Mr. Congrove's computer, Mr. Congrove also failed to take steps to preserve any of his email communications concerning either Mr. Zinna or the ColoradoWackoeExposed website.  Thus, even though there is now evidence of two paper printouts of two email messages sent to Mr. Congrove at his Jefferson County email addresses in the spring of 2006, Mr. Congrove and Jefferson County could produce no electronic version of those email messages when they were requested by Mr. Zinna in the spring of 2008, nor could the produce any other email messages that likely were exchanged by Mr. Congrove and others regarding Mr. Zinna or the ColoradoWackoExposed website.

Mr. Congrove's response to this loss of potentially relevant evidence appears to be two-fold – first to contend that Mr. Zinna never specifically requested electronically stored information in this case, and then second, to point the blame at Jefferson County officials who were responsible for the computer equipment.  Mr. Congrove contends that it would be inequitable and unjust to impose upon him any adverse repercussions based upon the failure of Jefferson County officials to preserve this potentially relevant information.

Mr. Congrove's effort to shift the blame, however, ignores the fundamental duty of every litigant to take reasonable steps to preserve potentially relevant evidence. *See Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 431 (S.D.N.Y. 2004). In this context, Mr. Congrove had his own separate and free-standing obligation to see to it that potentially relevant evidence should be preserved. Moreover, he is simply wrong in his assertion that Mr. Zinna did not request access to relevant email other electronic communications. Mr. Zinna did. The fact that such evidence appears to have once existed but is now unavailable necessarily implicates Mr. Congrove's failure to comply with his duty to preserve potentially relevant evidence and therefore warrants an adverse inference instruction for the jury. *See Cache La Poudre Feeds*, 244 F.R.D. at 629.

### Conclusion

In light of the foregoing, and based on the evidence to be presented at trial, Plaintiff anticipates that he will be entitled to a judgment in his favor on his claim for First Amendment retaliation under 42 U.S.C. § 1983.

Respectfully submitted this _3rd_ day of November, 2009,


By _____*s/ Christopher P. Beall*_____
Christopher P. Beall
Adam M. Platt

LEVINE SULLIVAN KOCH & SCHULZ, LLP
1888 Sherman Street, Suite 370
Denver, Colorado  80203
Tel.:  (303) 376-2400
Fax.:  (303) 376-2401
E-mail:      cbeall@lskslaw.com

Attorneys for Plaintiff
**Michael L. Zinna**

## CERTIFICATE OF SERVICE

I hereby certify that on this __3rd__ day of November, 2009, I electronically served the foregoing **PLAINTIFF'S TRIAL BRIEF** to the following counsel of record:

Patrick D. Tooley, Esq.
DILL DILL CARR STONBRAKER & HUTCHINGS, P.C.
455 Sherman Street, Suite 300
Denver, Colorado 80203
pdtooley@dillanddill.com

_s/ Christopher P. Beall_